Our next case is 4110935 Robinson v. Warwick. For the appellant is Gordon Kinnate. Yes. Is that pronounced correctly, sir? Yes. And Sarah Duffy. Before we begin, we ask you folks to be here early just in case we might be able to start early. We can't. And I thank you for being here. Mr. Kinnate, you may proceed. Your Honors, I'm Gordon Kinnate. I represent the defendants who are the appellants, of course. And this case involves a disputed 16.44 foot wide strip of land between two residence properties in Pontiac, Illinois. The defendants, Warwick and Lynn, bought their property, their properties on the east side, the old Wolfe house back in 2000. And this house had been owned by the Wolfe family since about 1909. And the Wolfe, the Robinsons, owned the house to the east. I'm sorry, to the west. They acquired their property in 1998. Both houses face south onto Grove Street and both above the river to the back of the property, the Vermillion River that cuts through Pontiac. There is a Crouse survey made in 1910 that's part of the record, of course, and that depicts all the properties well. And if the court has any questions about any of the property, that's a good reference. The Crouse survey made in 2010 shows a concrete driveway apron between the two properties, actually at the south end of the property going into the street where it widens out and cuts into the curb. And that exactly straddles the property line. The apron is nine and a half foot wide. There is a crosshatch cut into the apron where it abuts the property line of the property or is coterminous with it. The apron has been there since at least 1976. We know this from a 1976 survey that was attached as an exhibit to the plaintiff's complaint seeking an injunction. Also from a 1979 Sidwell overhead flyover photograph done from the assessor's office. And since the 1960s, we think, per the testimony of one of the witnesses, actually plaintiff's witness, Donovan Gardner. The testimony and the evidence in brief, Gerald Warwick and Tom Harris provided the most relevant testimony. In 1972, they were both about six years old. In 1974, John Wolfe, the son of the original purchaser of the property, who had lived in the property with his sister, Ellen, for many years. John Wolfe died in 1974. Warwick and Harris both testified that as young boys, they were what they called river rats in Pontiac. They played up and down the river and rode their bikes and they spent half their days along the river. And they both testified as to recollections of their conversations and observations when John Wolfe was there before he died. Namely, that he parked his truck there and there was some specific testimony about an encounter or two, a friendly encounter or two, that the Harris fellow particularly had when he would talk to John Wolfe about the beekeeping business that John Wolfe operated on the property. And the testimony in general, or in summary, was that the Wolfes parked their car on the strip, that John Wolfe even used the strip all the way back to the river where he had his beekeeping business and kept his bees. Warwick testified that he was on that property half his days as a kid. And he testified later that but for a year of college, when he did come back from college on weekends and vacations, he'd lived in Pontiac all his life and his family lived there. And he was just familiar with that property from 1974. 1972 was his earliest recollection, right up through the time he bought it. Of course, right up to the time of trial, he had knowledge about it. Deborah Robinson bought the property in 1998, as indicated, and Lynn in 2000. Warwick and Lynn both testified as to their daily use of the property from 2000 to 2008. And just in general, the elements of adverse possession, I think, aren't so much in question as to their testimony to it, but as to the elements of proof of the issues. They were all addressed, I guess I would say. Warwick and Lynn both testified that Robinson, they had neighborly relations with Robinson, that he saw them out there on their property daily and regularly, and they'd say hello and exchange pleasantries. And that they needed to fill in Warwick and Lynn, the back of their property, and they testified to hundreds of semi-loads of fill being backed down the strip and dumped down to the bank where the river bank had washed away and was eventually going to threaten the structural integrity of the house. And they said that this was obvious, and Warwick testified that there were occasions when he saw Robinson when this backwoods was going on. But this happened over quite a number of years. Counsel? Yes. Let me mention, we're all familiar with the evidence presented here, and as I had occasion to mention in the last argument, we're currently a panel of appellate judges, but cumulatively I think we have at least 40 years of experience as trial judges. I must say I'm extraordinarily impressed with the six-page, single-spaced, written decision of the trial court in this case, which seems to me bespeaks of great care and thoroughness by the trial judge, and listening to the arguments and applying the law and applying the facts as he found them. Where did he go wrong? And not only where did he go wrong, but where did he go wrong to the extent that no reasonable person could have reached the decisions he did, which is essentially the standard of review here. Let me cut to the chase, then, as invited to do. We think the essential issue is the role of circumstantial evidence, and as indicated, we think that circumstantial evidence, which we cited the decisions where the Supreme Court has favored or expressly approved the use of circumstantial evidence in adverse possession cases, and I think just the fact of the 20-year statute of limitations means the freshest adverse possession case is relying on old memories, and the ones that started 75 years ago, the first 25 years, maybe, of the adverse possession is long forgotten. A person could acquire prescriptive rights, remove the fence after 25 years, but still have ownership, had there been a case, and time passes and time passes, and 50 years later, all is forgotten. There's no witnesses available, and so I think that's probably why the circumstantial evidence is so important in these cases, and we think that, just in brief, here we had significant circumstantial evidence. We had, for example, this, well, in particular, this apron and photograph showing the apron and testimony as to the use of the apron in the driveway, and I would submit that the existence of the apron in the driveway, and certainly the apron straddling the property line and the drive straddling the property line, suggests that someone had the right to use that. Perhaps the property owner to the west, perhaps the property owner to the east, perhaps it was a common driveway. There was no evidence or testimony whatsoever that the property owner to the west had ever used it. There was a lot of testimony and clear proof, I think, that the property owner to the east, my clients and their predecessors entitled, did use the property, and we think that it's one or the other or both. It defies reason to me to think it's neither. Nobody had the right to it, and we think that certainly we were limited by the testimony we had because there was no one else available to testify as to these things, plus the circumstantial evidence. We think that looking at the circumstantial evidence, it's reasonable to conclude that with the facts and testimony at trial, since use of the property since the mid-1960s, per one of the Donovan Gardner, one of the plaintiff's witnesses, and then with more evidence from 1972 through the present, that there was a clear basis for concluding that the Warwick and Linn, my clients, had rights to the property which had been acquired through prescriptive means, and that the circumstantial evidence was such that it's illogical to conclude otherwise. And I think specifically the law in the Supreme Court cases included a statement that the elements of adverse possession could be adduced through circumstantial evidence, not just so it didn't limit it to possession of the property. It referred to all of the elements. So we think for those reasons that the trial court in its ruling, the third page of its ruling, it criticized the testimony of Warwick and Harris for their age, but we would submit that this testimony of Warwick and Harris from their early years, when they were six and seven and eight years old, was corroborated by Donovan Gardner. He said that these things occurred, John C. Wolfe using the property parking structure, since the mid-1960s, and we think that just as it's illogical to say because someone has a reason to lie or a clue that they're lying without something else suggesting that maybe they are, just because it's possible to posit that a six-year-old might not have a good memory of events is not, I think, dispositive of that issue. They may have a good memory of events, and they testified in such a manner that it seemed like they did have a good memory of events. Well except that Warwick had to come in the next time and correct his testimony, didn't he? Yes, he did. Warwick, I don't recollect whether this is of record or not, Warwick explained that this was the nature when someone brings up a fact, you say, oh yeah, that's right, and I have this, I suspect we all do, talking about an event, and somebody will say, well don't you remember this, and oh yeah, that all comes to mind. So that could be an indicator that he's being untruthful or that he had a bad memory. It could be an indicator that he had the natural reaction. That's why there are trial judges evaluating these things, not appellate judges from a cold record. Yes, and why there are appellate lawyers who present the opinion, I guess, of the, in summary, though, we think that this circumstantial evidence was sufficient to support the testimony of Warwick and Harris as to the use of this property. So for these reasons, we feel that the ruling was against the manifest weight of the evidence and that the trial court should have found that the property was that of the Warwick and Lind and their prescriptive occupation by the predecessor. Thank you, counsel. Thank you. Ms. Nugget. May it please the court. Counsel. I'm here today on behalf of the appellees, Delbert and Catherine Robinson. The sole question before the court today, which I think the court alluded to, is whether or not there was an abuse of discretion or the decision was against the manifest weight of the evidence in this case. Central to that decision review for the court today is the question of credibility. The trial court has to be given deference when you look at the witnesses and the credibility weight placed on their testimony. And I believe, as the court had alluded to earlier, Judge Travers did a very nice job of outlining what testimony was given to him and what weight he put on that testimony based upon the credibility of the witnesses. The defendants, or the appellants in this case, had three witnesses. Mr. Warwick, who is one of the appellants, and I would suggest that his evidence or his testimony was the primary testimony in this case. And the trial court pointed out his inconsistencies, his contradictory statements, and ended with the line that his questionable observations are inadequate to support a finding of adverse possession. So witness number one, not permitted based upon his testimony alone to establish adverse possession. Witness number two, who is also the appellant, Ms. Lind, has only lived in the property and has been familiar with the property only since 2000. So she has an eight-year window with which she should establish any facts for the case. Not long enough. We need 20 years. And the final witness that they presented was Mr. Harris. And while I don't think that the court found him not credible, what the court commented on was that there was a lack of continuity in his testimony. He was a young boy. He could not establish the continuous use that is necessary to make a claim for adverse possession in this case. So all three of the witnesses in combination cannot establish a basis for adverse possession. The burden is on the appellants to make that demonstration or showing for the trial court. All presumptions are made in favor of my client in this case. And I think one of the critical factors that there was no testimony as to was permission. And so the use of the property, if any, by the individuals in the Wolfe home, and subsequently Warwick and Lind, has to be assumed to be permissive. And alone, that makes the adverse possession claim fail in this case. We believe that the trial court's determination and weight of the credibility placed upon the witnesses supports his finding and is clearly not against the manifest weight of the evidence. The second claim made by the appellants is a request for promissory estoppel. Once again, credibility is an important factor. And deference is again given to the trial court in this case. And I think the, I want to make sure I get the quote right, the important finding by the court in this particular case is as to the conversations between Mr. Robinson, my client, and Mr. Warwick, Mr. Robinson's testimony was found to be more credible. So when you've got two individuals testifying and testifying as to whether or not there was this and the court finds Mr. Robinson more credible, it's clear that then that request has to fail when credibility is placed on my client. And so once again, we believe the trial court was correct in its decision and that it was not against the manifest weight of the evidence. And so for these reasons, we would ask this court to uphold the trial court's decision in this matter. Thank you, counsel. Mr. McKinney, any rebuttals there? Very briefly, Your Honor. Okay. As to the testimony of, again, of Warwick, yes, there were details that one could quibble about as to the testimony, but I think as to the central issues, it kind of makes me think of the situation with what did you wear that day when you robbed the store or something or when you observed this person robbing the store. Maybe that's not so relevant. That wouldn't be something that someone would remember. As to the central issues that Warwick testified to, I think he did well remember and certainly good cross-examination would suggest you delve into his memory. But imperfect memory as to irrelevant events, I don't think as a practical matter is particularly probative of inaccuracy of testimony. We'd rather do it the other way as counsel, but that's my response to that and I think it's relevant to hear. Warwick's testimony included that he saw the property over this long period of time on a daily basis. Well, I think he said every other day basis. He figured about half the days that he was on this property. So there was continuity in the testimony, I think, with respect to that. It did cover the time period. You don't have to have a witness there watching with a tape recorder observing every day. I don't think we have this possession. We have the existence of the driveway for every day and the apron. Thank you. Thank you, counsel. Thank you, Mr. Conlon. Advice would be a resource for a few minutes.